UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CHAUNCEY A. SIMPSON,
     Plaintiff,

vs.                     Case No.: 3:19cv2137/RV/EMT

OFFICER UPTON
and OFFICER MAULTSBY,
     Defendants.
_____/

## <u>REPORT AND RECOMMENDATION</u>

Presently before the court are the parties' cross-motions for summary judgment (ECF Nos. 49, 51). Defendants responded in opposition to Plaintiff's motion for summary judgment (ECF No. 52).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Upon consideration of the parties' submissions and the relevant law, the undersigned concludes that Defendants' motion for summary judgment should be granted and Plaintiff's motion for summary judgment should be denied.

I.    BACKGROUND

Plaintiff Chauncey A. Simpson (Simpson) commenced this case on July 14, 2019, by filing a civil rights complaint under 42 U.S.C. § 1983 (Compl., ECF No. 1). The operative pleading is Simpson's Amended Complaint (Am. Compl., ECF No. 11). Simpson names two Defendants, Officer J. Upton and Officer Maultsby (*id.* at 2). Simpson claims Defendants exposed him to unconstitutional conditions of confinement, in violation of the Eighth Amendment, by insisting he climb a stairway to the upper tier of the dormitory despite Simpson's medical pass restricting him to the lower tier due to a medical condition affecting his leg, hip, and back (*id.* at 5–7). Simpson fell twice while climbing the stairway, causing pain, suffering, physical injury, and emotional distress (*see* Am. Compl. at 6; Compl. at 7). Simpson seeks compensatory damages against Defendants in their individual and official capacities, and punitive damages against Defendants in their individual capacities (Am. Compl. at 7). Simpson also includes a request for injunctive relief (*id.* at 5).

On April 21, 2020, the court granted Defendants' motion to stay this case due to Defendant Maultsby's military deployment (*see* ECF No. 28, 31). Nearly one year later, on March 3, 2021, Defendants notified the court that Defendant Maultsby returned from deployment (*see* ECF No. 32). Simpson was released from the FDOC in mid-2021 (*see* ECF Nos. 33, 34, 40, 41). The case proceeded through discovery.

On September 24, 2021, Defendants filed a motion for summary judgment with supporting evidentiary materials (Defs.' Mot. Summ. J., ECF No. 49; supporting materials, ECF Nos. 49-1 through 49-6). On October 27, 2021, Simpson filed a cross-motion for summary judgment, with supporting evidentiary materials (Pl.'s Mot. Summ. J. and supporting materials, ECF No. 51). Defendants filed a response to Plaintiff's motion for summary judgment, with additional evidentiary materials (Defs.' Resp. to Pl.'s Mot. Summ. J. and supporting materials, ECF Nos. 52, 56).

## II.    APPLICABLE LEGAL STANDARDS

### A.    Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his case or present affirmative evidence that the nonmoving party will be unable to prove his case at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine

issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

To defeat summary judgment, the nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). And "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004); *see also Celotex Corp.*, 477 U.S. at 324. The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See Celotex Corp.*, 477 U.S. at 324; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file, designate

specific facts showing that there is a genuine issue for trial); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jones v. Cannon*, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he must prove. *See Celotex Corp.*, 477 U.S. at 317. A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322.

The standards governing cross-motions for summary judgment are the same, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the non-movant. *Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1404 (S.D. Fla. 2014) (citations omitted); *Avocent Huntsville Corp. v. ClearCube Tech., Inc.*, 443 F. Supp. 2d 1284, 1293–94 (N.D. Ala. 2006).

**B.    Eighth Amendment Standard**

All claims challenging conditions of confinement must demonstrate an infliction of pain "without any penological purpose" or an "unquestioned and serious deprivation of basic human needs" such as medical care, exercise, food, warmth, clothing, shelter, or safety. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *see also Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1571–72 (11th Cir. 1985). "To survive summary judgment in a case alleging deliberate indifference, a plaintiff must 'produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.'" *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003)). "The Eighth Amendment defines the contours of the first two elements and section 1983 delimits the third." *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993).

The first element requires the following showing:

First, under the "objective component," a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 999, 117 L. Ed. 2d 156 (1992). The challenged condition must be "extreme." *Id.* at 9, 112 S. Ct. at 1000. While an inmate "need not await a tragic event" before seeking relief, *Helling v. McKinney*, 509 U.S. 25, 33, 113 S. Ct. 2475, 2481, 125 L. Ed. 2d 22 (1993), he must at the very least show that a condition of his confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety, *id.*

at 35, 113 S. Ct. at 2481.  Moreover, the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the challenged condition of confinement].  It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.

*Chandler v. Crosby*, 379 F.3d 1278, 1289–90 (11th Cir. 2004).  The objective prong is concerned with both the "severity" and the "duration" of the prisoner's exposure to the alleged unconstitutional condition.  *Id.* at 1295.

The second element, deliberate indifference, has three components:  "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence."  *Goodman*, 320 F.3d at 1332 (internal quotation marks and citation omitted).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  The prisoner must show that the challenged conduct was "very unreasonable in light of a known risk" of harm or suffering.  *Hardin v. Hayes*, 52 F.3d 934, 939 (11th Cir. 1995) (citation omitted); *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1027 (11th Cir. 2001) ("[O]fficials, to be liable, must be aware of a substantial risk of serious harm to the inmates and not take reasonable measures to alleviate that risk.").  The deliberate-indifference standard is akin to "subjective recklessness as used in

the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994); *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020); *Goodman*, 320 F.3d at 1332 (the plaintiff must establish that defendants "knowingly or recklessly disregarded that risk"). "Deliberate indifference is about 'obduracy and wantonness, not inadvertence or error in good faith.'" *Mann v. Sec'y, Dep't of Corrs.*, No. 21-11445, 2021 WL 5112647, at *2 (11th Cir. Nov. 3, 2021) (quoting *Whitney v. Albers*, 475 U.S. 312, 319 (1986)). "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that a harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citations omitted).

Prison officials may avoid Eighth Amendment liability by showing, for example: (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger"; (2) that "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the

facts gave rise was insubstantial or nonexistent"; or (3) that "they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer* 511 U.S. at 844. The Court emphasized in *Farmer*:

> The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

511 U.S. at 837–38 (citations omitted).

Finally, with respect to causation, the plaintiff must show a causal link between the officer's failure to act reasonably and the plaintiff's injury. *Marbury*, 936 F.3d at 1233 (citation omitted). Section 1983 "requires proof of an affirmative causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation." *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993) (internal quotation marks omitted). The constitutional deprivation must, in turn, be "a legal cause of [the plaintiff's] injuries." *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982).

## III.    MATERIAL FACTS FOR PURPOSES OF SUMMARY JUDGMENT

The facts pertinent to the resolution of the motion and cross-motion for summary judgment are drawn from Simpson's verified pleadings (ECF Nos. 1, 11) and the evidence in the summary judgment record (ECF Nos. 49-1 through 49-6; ECF No. 51).  *See Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986) (holding specific facts pled in a sworn complaint must be considered in opposition to a motion for summary judgment).  Where the parties offer conflicting accounts of the events in question, the court "sets forth the facts, drawn from the evidence presented, in the light most favorable to the" nonmoving party.  *Snow ex rel. Snow v. City of Citronelle*, 420 F.3d 1262, 1265 (11th Cir. 2005).  Nevertheless, matters stated by a court as "facts" for purposes of summary judgment may not be the actual facts.  *See Montoute v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997).

Regarding the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions**.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
> . . . .
> **(4) Affidavits or Declarations**.  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

If a fact cannot be presented in a form that would be admissible in evidence, it cannot be used for purposes of summary judgment.  *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999); Fed. R. Civ. P. 56(c).  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment.  *See* Fed. R. Civ. P. 56(e)(2).

The events giving rise to Simpson's claim occurred at Santa Rosa Correctional Institution (Am. Compl. at 5–6; ECF No. 11).  Simpson was transferred to Santa Rosa C.I. on April 12, 2019, and housed in dormitory B-3 (Pl.'s Dep. 19:16–17, 23:18–20, ECF No. 49-3).  Simpson had a medical pass restricting him to the lower tier of the dormitory due to a medical condition affecting his leg, hip, and back (Pl.'s Dep. 17:21–23, 18:20–23; Am. Compl. at 5).

On April 30, 2019 (about two and half weeks after Simpson's arrival at Santa Rosa C.I.), at approximately 7:55 p.m., Defendants Upton and Maultsby came to Simpson's cell to escort him and his cell mate to the showers (Am. Compl. at 5; Pl.'s Dep. 39:4–7). Per protocol, Simpson backed up to the cell door, put his hands through the slot of the door, was handcuffed behind his back, and exited the cell (Pl.'s Dep. 39:8–14, 53:1–4). Officer Upton escorted Simpson, and Officer Maultsby escorted Simpson's cell mate (*id.*, 53:5–18, 53:25–54:5, 55:11–17; 56:8–9).

Officer Upton had his hand on Simpson's arm as they walked past the shower stalls on the lower tier (Pl.'s Dep. 44:8–11, 53:8–14). As Simpson and Upton walked past the lower tier showers, Simpson told Upton, "Hey, that is my shower right there." (*id.*, 44:10–11). Officer Upton responded, "[s]omebody is in it right now," and continued toward the stairway to the upper tier (*id.*, 44:12–14). Simpson stated, "I got a bottom tier pass. I am not supposed to be upstairs." (Pl.'s Dep. 44:14–15; Pl.'s Decl. ⁋ 2, ECF No. 51 at 1; Am. Compl. at 5). Simpson told Officers Upton and Maultsby he could not successfully climb stairs due to injuries in his leg, hip, and back (Am. Compl. at 5). Inmate Dontavious Brown was in one of the lower tier showers at that time and heard Simpson "tell officers that he had medical passes and

he could not go upstairs due to him having a rod in his leg" (Brown Decl., ECF No. 51 at 4–5).

According to Simpson, Officers Upton and Maultsby "were familiar with Mr. Simpson's handicap and obvious limp" and had previously seen him use the showers on the lower tier (Pl.'s Decl. ¶ 1). Simpson states "several times prior to this incident," he told Officers Upton and Maultsby that he had to use the lower tier showers and that he had a "handicap pass" (*id.*, ¶ 2).

Officer Maultsby denies that Simpson verbally informed him that he had a lower tier medical pass (Maultsby Decl. ¶ 5). Officer Maultsby further states Simpson "appeared to walk to the stairs without difficulty or complaint" (*id.*).

The FDOC's Health Services Inmate Orientation Handbook instructs inmates, "You must carry your [medical] pass on your person at all times." (Handbook, section N, ECF No. 49-6 at 9). Simpson did not have his medical pass on his person when he was escorted to the shower—the pass was in his cell (Pl.'s Dep. 37:9–25, 39:1–3). According to Simpson, it was customary that if an officer ordered an inmate to do something contrary to a medical pass, the inmate would inform the officer that he had a pass, and the officer would either excuse the inmate from the order or require the inmate to present the pass (*id.*, 59:17–24). Neither Upton nor Maultsby asked Simpson to present his medical pass (*id.*, 39:2–3).

Officers Upton and Maultsby insisted that Simpson go up the stairs (Brown Decl.; Pl.'s Decl. ℗ 3; Am. Compl. at 5).    Officer Maultsby states Simpson "consented" to the escort up the stairs and "did not verbally object or express any concerns about taking the stairs to the shower in my [Maultsby's] presence" (Maultsby Decl. ℗ 5).    Simpson stated during his pre-trial deposition, "we just agreed, we just said, well, okay, it will be okay because you will help me up the stairs" (Pl.'s Dep. 44:18–19).

On the stairway, Officer Maultsby escorted Simpson's cell mate ahead of Officer Upton and Simpson (Pl.'s Dep. 56:8–12).    Officer Upton held Simpson's arm during the escort (*id.*, 56:8–12).    Simpson missed a step and fell on the stairway onto his right knee and back (*id.*, 30:7, 30:23–24, 56:10, 63:14–16, 63:22–25). Officers Upton and Maultsby helped Simpson get up (*id.*, 54:10–11, 56:10–15, 57:12–13, 63:1–4).    Simpson immediately fell again onto his right knee, and the officers again helped him up (*id.*, 56:15–16, 63:5–12, 63:17–25, 64:12–25).    Officer Maultsby denies that Simpson fell on the way up the stairway (Maultsby Decl. ℗ 5).

Simpson and his cell mate were placed in the upper tier shower (Maultsby Decl. ℗ 6).    Simpson's cell mate became belligerent and refused to leave the shower (*id.*).    Sergeant Yates responded to the upper tier and directed officers to take Simpson to the lower tier shower to run water over his injuries (Am. Compl. at 6;

Pl.'s Dep. 72:21–24). Officers Upton and Maultsby escorted Simpson down the stairs, maintaining custodial holds on Simpson's arms (Maultsby Decl. ¶ 6). Simpson briefly slipped going down the stairs, but the officers caught him, and his body did not touch the stairs when he slipped (*id.*). Simpson was provided ibuprofen, water, and a sick call request (Am. Compl. at 6; Pl.'s Dep. 18:4–12, 72:21–24).

In the early morning of May 1, 2019 (the morning after the fall), at approximately 1:42 a.m., Simpson's cell mate attacked him (Maultsby Decl. ¶ 7; Pl.'s Dep. 95:1–96:25). Simpson was handcuffed behind his back at the time, but the cell mate was not (Pl.'s Dep. 95:2–14). Officers broke up the attack by applying chemical agents (Maultsby Decl. ¶ 7; Pl.'s Dep. 95:16–96:23). Officer Maultsby offered to take Simpson to the medical department, but Simpson said he was fine and did not need to go to medical (Maultsby Decl. ¶ 8).

Simpson's medical records indicate he was seen by a nurse in sick call on May 2, 2019 (Pl.'s medical record, ECF No. 49-4). Simpson complained of pain in his back radiating down his left leg (*id.*). He reported his pain began on April 30, 2019, when he was being attacked by this cell mate (*id.*). The nurse noted that Simpson displayed a shuffling gait and had scratches on his back (*id.*). In the section of the medical record titled "FINDINGS REQUIRING IMMEDIATE CLINICIAN NOTIFICATION," the nurse indicated the following:

> Back pain with **new** onset of numbness or tingling in either or both lower extremities
>
> Back pain which radiates through buttock and down one extremity

(*id.*) (emphasis in original).   The nurse provided Simpson with ibuprofen and scheduled a follow-up appointment (*id.*).   The nurse instructed Simpson to limit his activity, take ibuprofen "200 mg 2–3 tabs by mouth 3–4 times/day," and to return to sick call if his symptoms returned or worsened (*id.*).

On May 18, 2019, nearly three weeks after the fall, Simpson apparently declared a medical emergency and was seen by T. Kremer, a licensed practical nurse (Pl.'s medical records, ECF No. 49-5).   Simpson reported that despite his having a low tier pass, an officer took him upstairs and he fell twice, on his knees and back (*id.*).   Simpson complained of back pain and pain shooting down his legs (*id.*).   Nurse Kremer observed a bruise approximately 1.5 inches by .5 inches on Simpson's right knee, and a bruise approximately 1 inch by 1 inch on Simpson's left shin (*id.*). Kremer noted that the bruises were in early stages of healing, black and purple in color (*id.*).   Kremer also observed lacerations approximately 3 inches long on Simpson's medial to lower back, which were in healing stages with no scabbing but close to scarring (*id.*).   Nurse Kremer provided ibuprofen (*id.*).

While in the FDOC, Simpson was prescribed a muscle rub cream with a refill date of June 14, 2020 (Pl.'s prescription, ECF No. 51 at 14).  On August 6, 2020, Simpson was prescribed 30 tablets of naproxen 500 mg to be taken twice daily as needed and to last 90 days (Pl.'s prescription, *id.* at 12).  On two other occasions, Simpson was prescribed 60 tablets of naproxen 500 mg to be taken twice daily (Pl.'s prescriptions, *id.*).

On June 30, 2021, after Simpson was released from the FDOC, he was diagnosed with tachycardia (fast heart rate) and low back pain with right-sided sciatica (*see* Pl.'s medical record, ECF No. 51 at 7).  Simpson asserts the fall on the stairs caused the sciatica (Pl.'s Mot. Summ. J. at 2).

IV.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A.  **Defendants are entitled to qualified immunity on Simpson's claims for monetary damages against them in their individual capacities.**

Defendants contend they are entitled to qualified immunity on Simpson's individual capacity claims for monetary damages (Defs.' Mot. Summ. J. at 8–18, 19–22; ECF No. 49).  Defendants assert they were acting within the scope of their duties when they escorted Simpson to the shower (*id.* at 22).  They contend their conduct did not violate Simpson's Eighth Amendment rights (*id.* at 8–19, 22).

Simpson contends Defendants violated his Eighth Amendment rights by deliberately ignoring his request to use the low tier shower in light of his "obvious handicap" (Pl.'s Resp. to Defs.' Mot. Summ. J. at 1, ECF No. 51).  In support of his argument, Simpson cites *Farmer*, 511 U.S. at 835 and *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (*id.* at 1, 2).[1]

### 1.    Qualified immunity standard

The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To receive qualified immunity, a defendant must first prove that he or she was acting within the scope of his or her discretionary authority when the relevant conduct took place.  *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). Once that is shown, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate.  *Id.*

---

[1] Simpson also cites *Gutierrez v. Peters*, 111 F.3d 1464 (7th Cir. 1997).  However, that case is an Eighth Circuit case, which does not qualify as binding precedent for the qualified immunity analysis in this case.

In resolving questions of qualified immunity, courts engage in a two-pronged inquiry. *See Tolan v. Cotton*, 572 U.S. 650, 655 (2014). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right. . . . The second . . . asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 659 (citations, internal quotation marks, and alterations omitted) (first ellipsis in original). The court has discretion to decide which question to address first, *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009), but to survive a qualified immunity defense, the plaintiff must satisfy both showings, *see Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that *every* 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (emphasis added). This imposes an objective standard, and that objective standard is "measured by reference to clearly established law." *Harlow*, 457 U.S. at 818.

Because this objective standard is fundamental to the qualified immunity defense, the district court should determine if the law was clearly established at the time the incident occurred.  As the Supreme Court explained:

> If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful . . . .  If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

*Harlow*, 457 U.S. at 818–19.  If the law is not clearly established, then the court should dismiss the case against the government official.  If the law was clearly established, then the claim against the government official should go forward.

Recognizing that the clearly established law question turns on the law at the time of the incident, the district court must consider the law "in light of the specific context of the case, not as a broad general proposition . . . ."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The Supreme Court does not require a case directly on point, but "existing precedent must have placed the . . . constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741.  In other words, the facts of the case before the court must be materially similar to the facts in the precedent that clearly establishes the deprivation.  *See Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015)

(citation omitted).  To be clearly established, the precedent must give officials clear

warning of unconstitutional conduct.  *Id.*

In considering the law to conduct this analysis, the district court should

compare the facts of the case before it with the facts of those cases that the non-

moving party contends show the clearly established nature of the law.  As the

Eleventh Circuit has explained:

> For qualified immunity purposes, a pre-existing precedent is
> materially similar to the circumstances facing the official when the
> specific circumstances facing the official are enough like the facts in
> the precedent that no reasonable, similarly situated official could
> believe that the factual differences between the precedent and the
> circumstances facing the official might make a difference to the
> conclusion about whether the official's conduct was lawful or unlawful,
> in the light of the precedent.  Thus, every fact need not be identical.
> Minor variations in some facts (the precedent lacks arguably significant
> fact or contains an additional arguably significant fact not in the
> circumstances now facing the official) might be very important and,
> therefore, be able to make the circumstances facing an official
> materially different than the pre-existing precedents, leaving the law
> applicable—in the circumstances facing the official—not clearly
> established when the defendant acted.

*Merricks*, 785 F.3d at 559 (internal quotation marks omitted).

In one of its fairly recent opinions, the Supreme Court observed:

> In the last five years, this Court has issued a number of opinions
> reversing federal courts in qualified immunity cases.  The Court has
> found this necessary both because qualified immunity is important to
> society as a whole, and because as an immunity from suit, qualified

immunity is effectively lost if a case is erroneously permitted to go to trial.

Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined at a high level of generality.  As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case.  Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*White v. Pauly*, 137 S. Ct. 548, 551–52 (2017) (multiple citations, some quotation marks, and alterations omitted).

The court cannot consider just any caselaw to decide if a right was clearly established.  Only binding opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed, can serve as precedent for this analysis.  *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

And finally, because § 1983 "requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation," *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citation omitted), each defendant is entitled to an independent qualified immunity analysis as it relates to his or her actions and omissions.  "So [the court] must be careful to evaluate a given defendant's qualified-immunity claim, considering only

the actions and omissions in which that particular defendant engaged." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018).

### 2.    Discussion

Simpson does not dispute that Defendants were acting within the scope of their discretionary authority as FDOC correctional officers when the alleged constitutional violation occurred. The burden thus shifts to Simpson to show that qualified immunity is not appropriate.

As previously noted, Simpson cites *Farmer* and *Gamble* as clearly establishing that Officers Upton and Maultsby violated his Eighth Amendment rights.

*Farmer* involved a transsexual prisoner who claimed that prison officials showed deliberate indifference to his safety by failing to protect him from harm from other inmates in the general prison population. The Supreme Court vacated the district court's grant of summary judgment in favor of the prison officials and remanded for further proceedings, because the district court "may have mistakenly thought" that the plaintiff was required to provide a defendant with advance notification of a risk of harm. *Id.* at 849. The Court noted that advance notification was not a necessary element of a failure to protect claim, and that subjective knowledge may be inferred from other evidence in the summary judgment record,

such as (1) prison officials' admission that Farmer was a "non-violent" transsexual who, because of his "youth and feminine appearance," was "likely to experience a great deal of sexual pressure" in prison; and (2) a defendant's statement to Farmer that there was "a high probability" Farmer "could not safely function" at the prison. *Id.*

*Gamble* involved a prisoner who claimed that the director of the Texas DOC, the warden of Gamble's prison, and the Texas DOC's medical director/chief medical doctor at the prison hospital showed deliberate indifference to his medical needs after he injured himself performing a prison work assignment. 429 U.S. at 98. The Court held that deliberate indifference to serious medical needs of prisoners, whether manifested by prison doctors or prison guards, constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment and is cognizable under § 1983. *Id.* at 104–05. The Court opined that an inadvertent or negligent failure to provide adequate medical care did not rise to the level of an Eighth Amendment violation. *Id.* at 105–06. Applying that standard to the facts of Gamble's case, the Court affirmed the lower court's dismissal of Gamble's claim against the medical director/chief medical doctor and remanded Gamble's claims against the prison officials to the lower court for further consideration. *Id.* at 107–08.

Here, Defendants contend the facts, taken in the light most favorable to Simpson, do not show that they subjectively knew that taking Simpson up the stairs posed a substantial risk of serious harm to his safety (Defs.' Mot. Summ. J. at 15–17).  Defendants further contend the facts do not show that their conduct was more than "mere negligence" (*id.*).  Defendants assert Simpson admitted as much in his pre-trial deposition, relevant portions of which they attached to their motion for summary judgment (*see id.* at 13–15).

Simpson testified he had been at Santa Rosa C.I. for only a couple of weeks prior to his fall on the stairway (Pl.'s Dep. 23:21–23).  He testified he did not personally know Officer Upton or Officer Maultsby, and neither of the officers knew him (Pl.'s Dep. 24:3–7; 25:1–4).[2]  Repeatedly throughout his deposition, Simpson referred to Officer Upton and Officer Maultsby's conduct as a "mistake" and asserted that his deliberate indifference claim was based upon their failure to adhere to his medical pass:

> I guess they kind of like, . . . it was an honest mistake.  I don't think they really be [sic] trying because these officers are good, I know them, you know, they were trying to help me.
> . . . .
> But it was just like I say, a mistake that Upton and Mossy [sic] Officer Upton and Mossy made.

---

[2] The court reporter transcribed Officer Maultsby's name as "Mossy" throughout the deposition transcript.

. . . .

[T]hese officers [Upton and Maultsby], they actually, they were good, they were decent officers, you know.  You know, they would treat people fair.  That is why it was just like a mistake they made.  It wasn't like they planned it, you know, I won't say that they wanted to—

      Q.  They didn't do it on purpose?

      A.  Yes, I don't think they, but they ended up hurting me anyway.  I end up getting hurt.  But they just covered their deliberate indifference, not because of them targeting me.  I didn't know them.  It is not like they—it is just that when I let them know I had the passes, anybody you let them know, they are supposed to adhere to it.

      Q.  So more like negligence?

      A.  Right, right, I would say that, yes.

. . . .

[B]ut these officers maybe they were trying to hurry up, maybe they were like shorthanded on the shift because they are shorthanded a lot of times.  So this is what happened and I just happened to be negligent [sic] because they were trying to hurry up and finish, they were shorthanded, and hurry up and finish the showers, and then I fall on the way up.  They are trying to take me to the stairs, fall twice and they helped me up, you know.

. . . .

I feel like my pass wasn't adhered to, that is how I feel.

. . . .

[H]e [Upton] had his hand on my arm helping me all the way walk to the stairs and past the shower, because when we walked past the handicaps I said, hey, that is my shower right there.  And he is like, somebody is in it right now.  And he was trying to hurry up and he was just going to take me upstairs, and I said, you know, I got a bottom tier pass, I am not supposed to be upstairs.  And you know, you know, well, they both helped me, like Upton and Mossy helped me up.  It wasn't like, it wasn't like one of them we just agreed, we just said, well, okay, it will be okay because you will help me up the stairs.  They—me letting

them know I am not even supposed to be go upstairs, I need my bottom tier shower.

. . . .

And I have to say, these officers, there was nothing that I had against them, they had against me.  I didn't even want to write them up [in grievances].

. . . .

So these guys, officers I never had any kind of words, never irate, never, argument, nothing.  They never got irate with me or loud, bad words with me, me never with them.  I always respected them, they always respected me.  This is just negligence on account of they were just trying to hurry up and finish the showers and didn't recognize, adhere to my passes, that is all.

. . . .

[T]hese officers went out of their way, still went out of their way to be nice to help me out after the fact.  But it is just chain affect [sic] that I fell and these injuries happened.  You know, I just tried to do everything I possibly can and they did have me seen by medical, and you know, these guys are good officers.

. . . .

     Q.  And then after you were back in your cell, did Officer Mossy or Upton, they came and checked on you, right?

     A.  Yes, ma'am.  They even gave me an extra [food] tray that morning.  Yes, they were trying to help me out.  Upton, he is a great guy, you know, goods guys.  They need more officers like them, it is just that sometimes we get caught up in our work, we get busy and things like this may slip through the cracks that a person had a pass, they wasn't supposed to be upstairs in the first place, but it just happened, you know.  But I don't think they should lose their job . . . .

(Pl.'s Dep. 17:1–5; 18:15–16, 24:10–25; 30:17–25, 36:5–6, 44:8–21, 57:13–15, 59:9–16, 72:11–16, 74:14–25).[3]

Neither the Supreme Court nor the Eleventh Circuit has adopted a per se rule that an officer's ignoring a medical pass amounts to deliberate indifference. *See Redding v. Georgia*, 557 F. App'x 840, 844 (11th Cir. 2014) (holding, in the context of prison officials' assigning a disabled prisoner to an upper bunk contrary to his medical profile, which indicated the need for a lower bunk: "It may have been negligent to assign [the prisoner] a bunk contrary to his profile, but an Eighth Amendment clam requires conduct rising to a level above even gross negligence. This was not shown here, as [the prisoner] did not allege facts showing a culpable state of mind on the defendants' part.") (citing *Goodman*, 718 F.3d at 1332); *see also, e.g.*, *Martinez v. Linton*, No. 4:18cv546/WS/MJF, 2021 WL 2211349, at *4 (N.D. Fla. May 6, 2021) (officer was entitled to judgment on the pleadings where inmate asserted officer ignored his medical pass, but inmate did not assert facts

---

[3] Simpson's characterization of Defendants' conduct as negligence is not binding, especially since he is proceeding without legal counsel. *See Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law."); *see also, e.g.*, *Mann*, 2021 WL 5112647, at *3 n.2 (noting that the court was not required to accept a medical expert's bare legal conclusion that a doctor's conduct was grossly negligent and the equivalent of recklessness as defined in Florida law) (citing *Montgomery*, 898 F.2d at 1541).

suggesting that officer knew he was exposing inmate to a substantial risk of serious harm when he ignored the medical pass), *adopted*, 2021 WL 2209318 (N.D. Fla. June 1, 2021).[4]

Simpson alleges more here. He alleges Officers Upton and Maultsby saw his "obvious" limp and previously saw him use the lower tier showers. Simpson also alleges he told Upton and Maultsby he had a medical pass restricting him to the lower tier and could not successfully climb stairs due to injuries in his leg, hip, and back. Simpson alleges the "obvious limp" he displayed at the time of the fall (and two weeks prior) was caused by the condition of his leg, hip, and back; and the fall on April 30, 2019, worsened his condition.

Defendants argue the court should reject Simpson's assertion that he walked with an obvious limp in April of 2019, because video evidence refutes it. Defendants submitted a video and assert it depicts Simpson walking in a breezeway and a dormitory without difficulty and without a visible limp on May 10, 2021—two years after the fall (*see* Defs' Resp. to Pl.'s Mot. for Summ. J. at 2–7; ECF No. 56 (video)). Defendants contend the fact that Simpson did not walk with a limp or other visible impairment after a fall that allegedly worsened his condition, logically and

---

[4] The undersigned recognizes that unpublished Eleventh Circuit opinions and district court opinions are not binding authority but cites them as persuasive authority.

conclusively refutes his assertion that he walked with an obvious limp at the time of the fall (*id.*).

"[W]here an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible." *Morton v. Kirkwood*, 707 F. 3d 1276, 1284 (11th Cir. 2013). But video evidence may not be obviously contradictory if it fails to portray the fact(s) in dispute. *See, e.g., Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (declining to rely on video evidence to discredit the plaintiff's version of events entirely because the video lacked sound and was periodically obstructed).

The video files provided by Defendants play in a frame-by-frame mode, as opposed to a continuously streaming mode, and do not clearly depict Simpson's gait. Because the video does not "completely and clearly" contradict Simpson's assertion that he walked with an obvious limp around the time of the fall in April of 2019, the court declines to rely on the video to discredit Simpson's assertion.

However, even accepting the fact that Simpson walked with an obvious limp at the time he fell and immediately preceding the fall, the court concludes the facts are insufficient to permit a reasonable factfinder to infer that either Upton or Maultsby subjectively knew that Simpson was unable to safely negotiate the stairs with an escort. *See, e.g.*, *Morris v. Baker*, No. 5:14cv211/WS/EMT, 2016 WL

4424977, at *7 (N.D. Fla. July 14, 2016) (officer was entitled to summary judgment where inmate asserted officer knew he was a "seizure patient" and ignored his medical pass for housing with another inmate on a low tier in a low bunk; there was no evidence suggesting officer was subjectively aware that housing inmate alone on the upper tier placed inmate at a substantial risk of serious harm), *adopted*, 2016 WL 4414808 (N.D. Fla. Aug. 18, 2016); *Hall v. Moore*, No. 3:14cv140/MCR/CJK, 2015 WL 9946410, at *9 (N.D. Fla. Dec. 29, 2015) (one particular officer was entitled to summary judgment where inmate asserted three officers were deliberately indifferent to his health and safety, by ignoring prescribed medical pass restricting him to low tier cell due to a medical condition affecting his leg and requiring him to climb and descend stairs while in hand restraints; there were no facts to support an inference that the particular officer knew that inmate was at substantial risk of serious harm by being housed on upper tier, where officer never witnessed any action by inmate indicating he was unable to safely negotiate stairs), *adopted*, 2016 WL 394012 (N.D. Fla. Feb. 1, 2016).

No doubt, a reasonable factfinder could find, from the evidence viewed in Simpson's favor, that Officer Upton and Officer Maultsby acted negligently and made a good faith error by escorting Simpson up the stairs. Simpson himself admits that the officers were "good" and "decent" officers who treated inmates fairly; they

had nothing against him personally; they took him upstairs because the showers on the lower tier were occupied and they were rushing to finish inmate showers; they escorted him up the stairs, with Upton holding Simpson's arm during the escort; and they went out of their way to help Simpson after he fell.  But there is no evidence from which a reasonable juror could infer that either officer consciously disregarded a substantial and unjustifiable risk attached to escorting Simpson up the stairs, "in gross deviation from accepted standards."  *See Borden v. United States*, 141 S. Ct. 1817, 1824 (2021) (defining criminal recklessness) (internal quotation marks and citation omitted).

Moreover, even if Simpson satisfied his burden as to the first prong of the qualified immunity analysis, he has not met his burden as to the second prong. Neither *Farmer* nor *Gamble* (the only binding precedent cited by Simpson) put Defendants on notice that their escorting him up the stairs under the circumstances Simpson describes violated his clearly established constitutional rights.

Considering the undisputed facts, and construing the disputed facts in Simpson's favor, Simpson has not met his burden of showing that Defendants are not entitled to qualified immunity on his claims for monetary damages against them in their individual capacities.  Therefore, Defendants are entitled to summary judgment on those claims.

Case No.:  3:19cv2137/RV/EMT

**B.    Defendants are entitled to immunity on Simpson's claims for monetary damages against them in their official capacities.**

To the extent Simpson seeks monetary damages against Defendants in their official capacities, those claims are barred by the Eleventh Amendment.   The Eleventh Amendment is an absolute bar to suit for monetary damages by an individual against a state or its agencies, or against officers or employees of the state or its agencies in their official capacities.  *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974).  Absent waiver or express congressional abrogation, neither of which is present in this case, the Eleventh Amendment bars a § 1983 plaintiff's claims for monetary damages against individual employees of the Florida Department of Corrections in their official capacities.  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65, 71 (1989) (holding that the Eleventh Amendment bars a section 1983 suit against a State and state officials in their official capacities); *McKinley v. Kaplan*, 177 F.3d 1253, 1256 (11th Cir. 1999) (holding that section 1983 does not create a cause of action for money damages against the States, a State agency, or State officials in their official capacities).  Therefore, Defendants are entitled to summary judgment on Simpson's official capacity claims for monetary damages against them in their official capacities.

**C.    Simpson's request for injunctive relief is moot.**

Simpson's Amended Complaint seeks an order requiring Defendants to post his medical passes in the officers' station to "avoid being taken upstairs again" (Am. Compl. at 6).  However, this request for injunctive relief has been rendered moot by Simpson's release from the FDOC.[5]  *See Zatler v. Wainwright*, 802 F.2d 397, 399 (11th Cir. 1986) (inmate's release from prison mooted claim for declaratory and injunctive relief).

## V.    SIMPSON'S MOTION FOR SUMMARY JUDGMENT

In Simpson's motion for summary judgment, he argues he has clearly established that Defendants violated his Eighth Amendment rights (Pl.'s Mot. for Summ. J. at 1–2).  Simpson's arguments in support of summary judgment are the same arguments he makes in opposition to Defendants' motion for summary judgment.  As discussed *supra*, viewing the evidence in the light most favorable to Simpson, no factfinder could reasonably infer that either Defendant was deliberately indifferent to Simpson's safety.  Therefore, Simpson is not entitled to summary judgment in his favor.

---

[5] Moreover, because the facts, viewed in the light most favorable to Simpson, do not show that either Defendant violated his Eighth Amendment rights, as discussed *supra*, Simpson is not entitled to any relief, including injunctive relief, on his Eighth Amendment claim.

Case No.:  3:19cv2137/RV/EMT

VI.    CONCLUSION

Defendants are entitled to qualified immunity on Simpson's claims for monetary damages against them in their individual capacities. Simpson's claims for monetary damages against Defendants in their official capacities are barred by the Eleventh Amendment. And Simpson's request for injunctive relief has been rendered moot by his release from the FDOC. For these reasons, Defendants' motion for summary judgment should be granted, and Simpson's cross-motion for summary judgment should be denied. Defendants are entitled to entry of judgment in their favor.

Accordingly, it is respectfully **RECOMMENDED** that:

1.    Defendants' motion for summary judgment (ECF No. 49) be **GRANTED**.

2.    Plaintiff's motion for summary judgment (ECF No. 51) be **DENIED**.

3.    The clerk of court be directed to enter judgment in favor of Defendants and close this case.

At Pensacola, Florida this <u>21</u>st day of December 2021.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**